## WILHELMSEN v. TWEEDIE TRADING CO.

## TWEEDIE TRADING CO. v. WILHELMSEN.

(District Court, S. D. New York. December 8, 1906.)

SHIPPING—TIME CHARTER—RIGHTS OF PARTIES WITH RESPECT TO DOCKING VESSEL.

A steamer was under a time charter for a year providing that she should be docked and cleaned at least once in six months, payment of the hire to be suspended until she was again in condition for service. After the discharge of her cargo at Hankow, China, 600 miles up the river from Woosung, on the coast, the charterer, which desired her to proceed next to a port of Japan, delivered her to the owner for docking; the six months having expired. There were no docking facilities at Hankow, but when she reached Woosung she was ordered by the owners to Shanghai, a few miles distant, for docking. When again ready for service, the charterer demanded that she be redelivered at Hankow, which the owners refused, but delivered her at Woosung, where she was accepted without waiver of the charterer's contentions, and ordered to Japan. The charterer refused to make further payments of hire due under the charter until the docking dispute should be settled, and the owners subsequently withdrew her from the charter as authorized on default in the payment of hire. *Held*, that the delivery of the vessel for docking at Hankow, where she could not be docked, and the demand for her redelivery there, where she was not wanted by the charterer, while perhaps technically within its rights, was unreasonable, and that as reasonably and fairly construed the owners fully complied with the charter and were entitled to recover the charter hire and damages for its breach.

In Admiralty. Suit to recover charter hire, and cross-libel for breach of charter.

Convers & Kirlin, for Wilhelmsen.

Wheeler, Cortis & Haight, for Tweedie Company.

ADAMS, District Judge. The first of the above entitled actions, Wilhelm Wilhelmsen against the Tweedie Trading Company, was brought to recover certain due hire of the steamship Tiger, said to be due under a charter dated September 2, 1904, at New York, providing for the hiring of said steamer for a period of one year from her delivery to the charterer, which was the 26th day of October. The steamer was withdrawn from the charterer's service on the 4th day of August because of the non-payment of hire after June 10th, 1904,

and it is alleged that there remains due hire from that day, excepting for a period from June 16th at 6 P. M. to June 25th at noon, when she was off hire through docketing, which, at the charter rate of £750 a month, amounts to $1218.12 and allowing for an address commission of $133.06, leaves due the libellant $5189.29. It is alleged that to this sum should be added the sum of £8, representing the outward expenses at Shanghai; also £9.10 an improper deduction from the hire paid for rat screens and life guards; also the sum of £20, the cost of cables necessitated through the respondent's refusal to pay hire in accordance with the contract; also the estimated sum of £2084.13.4 damages proximately resulting from the respondent's refusal to carry out its terms of the contract. It is alleged that the total amount due by the respondent for damages and disbursements was £2122.11.4 or in currency of the United States $10,329.46. Adding this sum to the hire, the total claim is $15,518.75.

The answer denies that this claim is due and alleges that the withdrawal of the steamer from the charterer's service was wrongful and improper and constituted a breach of the terms of the charter party and a cause of large damages to the respondent, estimated at $20,000, which it is entitled to set off against any claim the libellant may have. It then alleges:

"Ninth. Further answering the libel and as a defense thereto the respondent alleges that the charter party set forth in the Second Article of the libel contained among other things the following clause:

'That as the steamer may be from time to time employed in tropical waters during the term of this charter, steamer is to be docked, bottom cleaned and painted whenever Charterers and Master think necessary, but at least once in every six months, and payment of the hire to be suspended until she is again in proper state for the service.'

On or about the 10th day of June, 1905, the Steamship 'Tiger' was at Hankow, and at that time more than six months had elapsed since the steamer had been docked, bottom cleaned and painted, and the respondent thereupon duly notified the libellant that the steamer required to be docked, bottom cleaned and painted, and duly redelivered the said steamship to the libellant for such purpose on or about the 10th day of June, 1905, aforesaid, and the libellant accepted the said Steamship 'Tiger' for such purpose, and thereupon the hire of said steamer ceased until such time as she should be again redelivered to the respondent. On or about the first day of August, 1905, the respondent was notified by libellant that the steamer was ready for respondent's use and redelivered the said steamship to the respondent and thereafter the respondent ordered her to proceed to Victoria, B. C. And in accordance with the terms of the charter-party paid to the libellant's agents a half monthly instalment of hire in advance. The libellant refused to allow her so to proceed and refused to carry out the terms of the charter-party. By reason of the aforesaid refusal of the libellant to carry out the terms of the charter-party the respondent sustained damages which as nearly as they can be now estimated amount to about the sum of Twenty thousand Dollars ($20,000). The respondent is entitled under the terms of said charter-party to recover said sum from the libellant and asks that it may be set off against any claim to which the libellant may be adjudged entitled herein.

Tenth. Further answering the libel and as a further defense thereto, the respondent alleges that at the time the said steamship 'Tiger' was re-delivered to the libellant at Hankow she had on board 132-16/20 tons of bunker coal, which was of the reasonable and market value of $1538.14, and that thereafter the master of said steamship caused to be laden aboard said steamship 750 tons of coal at Shimonoski and 80 tons of coal at Shanghai for which the respondent was forced to pay $2847.54, which was the reasonable and market

149 F.—59

value of said coal. The respondent is entitled under the terms of said charter-party to recover said sums from the libellant, and asks that they may be set off against any claims to which the libellant may be adjudged entitled herein.

Eleventh. Further answering the libel and as a separate defense thereto the respondent alleges that it advanced and disbursed for the owners of said steamship at her master's request the following sums, to wit;

| | |
|---|---:|
| Disbursements at Shimonoski | $177.70 |
| "          " Hankow | 997.36 |

The respondent is entitled under the terms of said charter-party to recover said sum from the libellant and asks that it may be set off against any recovery to which the libellant may be adjudged entitled herein."

## The respondent also filed a cross libel alleging:

"Second. On or about the 2nd day of September, 1904, at New York a charter-party was entered into between the libellant and respondent, through his duly authorized agents, Bennett, Walsh & Company, whereby the libellant agreed to hire and the respondent agreed to let the Steamship 'Tiger' from the time of delivery for a period of time from October 21st, 1904 up to October 1st or 31st, 1905. Among other provisions the charter-party contained the following:

'19. That the owners shall have a lien upon all cargoes and all sub-freights, for any amounts due under this charter, and the charterers to have a lien on the ship for all moneys paid in advance and not earned.'

'21. (Quoted supra from the answer). Said charter-party is hereby referred to and made party of this libel.

Third. Thereafter the steamship 'Tiger' was delivered to the libellant and entered upon the charter aforesaid. On or about the 10th day of June, 1905, the Steamship 'Tiger' was at Hankow, and at that time more than six months had elapsed since the steamer had been docked, bottom cleaned and painted, and the libellant thereupon duly notified the respondent that the steamer required to be docked, bottom cleaned and painted, and duly redelivered the said steamship to the respondent for such purpose on or about the 10th day of June, 1905 aforesaid, and the respondent accepted the said Steamship 'Tiger' for such purpose, and thereupon the hire of said steamer ceased until such time as she should be again redelivered to the libellant. On or about the 1st day of August, 1905, the libellant was notified by respondent that the steamer was ready for libellant's use and thereafter the libellant ordered her to proceed to Victoria, B. C. The respondent refused to allow her so to proceed and refused to carry out the terms of the charter-party and thereafter notified the libellant that he had withdrawn the steamer from libellant's use. Said withdrawal was wrongful and improper and in violation of the provisions of the charter-party aforesaid. By reason of the aforesaid withdrawal and refusal of the respondent to carry out the terms of the charter-party the libellant has sustained damages which as nearly as they can be now estimated amount to about the sum of Twenty thousand Dollars ($20,000).

Fourth. At the time the said Steamship 'Tiger' was redelivered to the respondent at Hankow she had on board 132-16/20 tons of bunker coal, which was of the reasonable and market value of $1538.14, and thereafter the master of said steamship caused to be laden aboard said steamship 750 tons of coal at Shimonoski and 80 tons of coal at Shanghai for which the libellant was forced to pay $3376.87, which was the reasonable and market value of said coal. The libellant is entitled under the terms of said charter-party to recover said sums from the respondent.

Fifth. The libellant advanced and disbursed for the respondent at the request of the master of the Steamship 'Tiger,' the following sums, to wit:

| | |
|---|---:|
| Disbursements at Shimonoski | $177.70 |
| "          " Hankow | 997.36 |

The libellant is entitled under the terms of said charter-party to recover said sums from the respondent.

Sixth. By reason of the premises payment of the aforesaid sums of $20,000, $1538.14, $2847.54, $177.70 and $997.36 amounting in all to $25,560.74 has become due and payable from the respondent to the libellant. Payment of the

said sums have been demanded of the respondent by the libellant, but the respondent has refused and still refuses to pay the same, or any part thereof and the same remains wholly due and unpaid.

The libellant has performed all the obligation and stipulations of the said charter-party on its part to be performed."

The libellant's answer to the cross libel was practically a denial thereof.

It appears that the Tiger was delivered to the respondent on the 25th day of October, 1904, and thereafter was docked at Marseilles on November 29, 1904. After making a voyage to the East, she came to New York. In the meantime, the charterer had closed her for another voyage to the East with a cargo of case oil and when in New York, the secretary notified the master that though the charterer was not then entitled to have her docked, it would be when she reached Hankow, China, and as the docking would be much more expensive there, suggested that it be done at the time in New York. This the libellant declined and she proceeded on the voyage. She arrived at Hankow on the 29th of May, 1905. On June 6th, while the cargo was being discharged there, the charterer notified the owner's agents in New York that upon the completion of the discharge, the steamer would be delivered to the owner for docking in accordance with the provision of the charter. The discharge was completed on June 10th. The owner was notified that the charterer wished the steamer to dock and paint at once, to which the owner replied that she would dock and paint on arrival at first place where facilities existed. Thereupon the charterer caused a cable to be sent to the owner that it insisted upon an immediate docking and had ordered the steamer to proceed to Moji, Japan, for such purpose.

There being no dock at Hankow, it was necessary that she should go to some place where one could be had. Some selection had to be made and the charterer chose Moji in the absence of the selection of a port by the owner, where the work could be done. The vessel was on the voyage to Moji when she was intercepted by the owner at Woosung, at the mouth of the Yangtze-Kiang River and ordered to Shanghai, where she was docked. Here the docking was done at a large expense, incidental to Chinese tonnage dues, a considerable portion of which might have been avoided by sending her to a Japanese port.

When the docking was finished at Shanghai, it is alleged that notice was given to the charterer that the steamer was in readiness for service again and the dispute turns principally upon the parties' obligation with respect to the hire due. Section 21 provides for docking as hereinbefore quoted.

It will be observed that no provision is made with respect to notice to the charterer of a completion of the drydocking but it has been shown, that general custom provides in such a case that the owner is required to give notice to the charterer of the steamer's readiness to resume service after docking, at the same port where she went off hire. It seems that a burden is placed upon the owner of giving notice of such readiness but the owner here offered only to resume the service at Woosung, while the charterer claimed that it was entitled to have the vessel returned to Hankow, some 600 miles distant and difficult to reach because of a strong current in the river. Perhaps the charterer was technically

right but practically the owner was giving the charterer all it was entitled to. Woosung was en route to a place where the charterer wished the steamer to go, which was Moji, and where it subsequently ordered her. It really did not want her at Hankow. It started her from that place to Moji, of its own volition, and took her there after the docking at Shanghai.

The charterer sought to deliver her at Hankow in the evident expectation that the owner, in view of the expense he would necessarily be subjected to for docking in that vicinity, would yield to the former's desire for a renewal of the contract upon the existing terms, which were apparently for the charterer's benefit. The owner, however, replied that the docking could be done at Shanghai or Nagasaki, as the master might determine and so ordered the master, who thereupon selected Shanghai. When the docking and some repairs made there were finished, June 25th, she proceeded to Moji in pursuance of orders received from the charterer, given without prejudice to the charterer's contentions in the matter.

The selection of Shanghai might have been a violation of the charterer's rights, as stated above, if it had wished to send the steamer further up the river in the pursuit of its business, and in that case there might be some merit in the claim that the charterer was entitled to have her docked elsewhere, but the charterer did not so desire. It wanted the steamer at Moji, as a convenient place in its own interests. It does not seem that under the circumstances there was any merit in the claim that the steamer should go off hire at Hankow. Shanghai, in view of its proximity to Woosung, where the owner offered to have her resume service, was on the route to Moji, and a proper place for docking. It was expensive for the owner but convenient for the charterer, therefore a suitable selection by the owner and I fail to see any just ground of complaint on the charterer's part. Sending her back to Hankow if the charterer were entitled to have her resume service there, would have been an evident waste of time in all respects.

The hire was not paid after June 10th. The contract provided:

"6. Payment of the said hire to be made in cash half monthly in advance in New York, at the current rate of Bankers short sight bills on London in U. S. Gold or its equivalent, and in default of such payment or payments as herein specified, the Owners shall have the faculty of withdrawing the said steamer from the service of the Charterers, without prejudice to any claim, they, the Owners, may otherwise have on the Charterers, in pursuance of this Charter."

After failure to make several due payments in excuse of which the charterer alleged that it was awaiting settlement of the docking dispute, the owner availed himself of his right of withdrawal, which, it seems to me, he was entitled to exercise.

The libellant Wilhelmsen is allowed a decree for the hire, excepting for the time occupied in docking, which will be computed as though it were done at Woosung, with order of reference to compute also the amount of his damages for the breach of contract. The cross libel will be dismissed. The dismissal, however, does not preclude the charterer from showing before the commissioner any disbursements made on the owner's account and for which it should be allowed credit in his action.